UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE AND JOHN DOE, | Civil Action No.: __22-v-06066_____ |
| Plaintiffs, | |
| vs. | COMPLAINT |
| | DEMAND FOR JURY TRIAL |
| NEW YORK FERTILITY INSTITUTE, M. FATEH & K. SULTAN M.D.S., P.C., 1016 5TH AVE. GYNECOLOGY, P.C., MAJID FATEH, KHALID M. SULTAN, AND MICHAEL FEMI OBASAJU, | |
| Defendants. | |

Plaintiffs Jane Doe and John Doe (together, the "Plaintiffs"), through their undersigned counsel, and upon knowledge of their conduct and information and belief as to all other matters, alleges for their Complaint against defendants New York Fertility Institute, M. Fateh & K. Sultan M.D.S., P.C., 1016 5th Ave. Gynecology, P.C., Majid Fateh, Khalid M. Sultan, and Michael Femi Obasaju (collectively, the "Defendants") as follows:

## I.    Nature of the Action

1.        Plaintiffs, a married couple living in London, want very much to have a daughter together. Their best chance to realize their dream is through in-vitro fertilization. After research and consultation, they trusted their dream to the New York Fertility Institute (believed to be synonymous with M. Fateh & K. Sultan M.D.S., P.C. and/or 1016 5th Ave. Gynecology, P.C.) (collectively, the "Clinic"), its principals, Drs. Fateh and Sultan, and its embryologist, Mr. Obasaju, Ph.D.

2.      It turns out, their bargain and professional relationship was built on lies. From the start, their agreement and trust were violated. The Does were lured into contracting with Defendants and continuing to pay fees for services by the information provided on NYFI's website and the continuing representations of its doctors and staff. Defendants represented that they offered all of the services the Does sought. Defendants represented that the Clinic could work with their timeframe and the Clinic had never lost, mislabeled, or mis-implanted an embryo.

3.      Shockingly, the Does recently learned that the Clinic is shutting down, with no contingency plan for completing the Does' treatment per the Does' schedule and that the Clinic's repeated representations to them before and during treatment that it had never lost, or mislabeled embryos were knowingly false.

4.      The Does never would have trusted and contracted with the Defendants for IVF services had they known this information.

5.      Moreover, throughout the IVF process, including genetic testing, the Defendants failed to provide sufficient information for the Does to provide their informed consent to the services.

6.      These actions constitute breach of contract, breach of the implied covenant of good faith and fair dealing, fraud and fraudulent inducement, and violations of NY §§ GBL 349 and 350. The Defendants' actions resulted in significant damages.

## II.     Jurisdiction and Venue

7.      This Court has jurisdiction under 28 U.S.C. § 1332(a)(2). Plaintiffs are citizens of the United Kingdom and the United States and are domiciled in the United Kingdom. The

Defendants are citizens of New York. The amount in controversy, exclusive of fees and costs, exceeds $75,000.00.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b).

**III.     The Parties**

9.      Plaintiffs are married, live in London, and desire to have a daughter together.

10.     Defendant New York Fertility Institute is a fertility clinic doing business in the State of New York. "New York Fertility Institute" is a d/b/a of defendant M. Fateh & K. Sultan M.D.S., P.C. Its principal place of business is located at 1016 Fifth Avenue, New York, New York 10028. Defendant New York Fertility Institute is in the business of providing fertility-related services to the public.

11.     Defendant M. Fateh & K. Sultan M.D.S., P.C. is an entity organized and existing under the laws of the State of New York. Its principal place of business is located at 1016 Fifth Avenue, New York, New York 10028. Defendant M. Fateh & K. Sultan M.D.S., P.C. is in the business of providing fertility-related services to the public.

12.     1016 5th Ave. Gynecology, P.C. is an entity organized and existing under the laws of the State of New York. Its principal place of business is located at 1016 Fifth Avenue, New York, New York 10028. 1016 5th Ave. Gynecology, P.C. is in the business of providing fertility-related services to the public.

13.     Defendant Khalid M. Sultan is a fertility specialist, practicing in New York. He is licensed in the State of New York. He has an office located at 1016 Fifth Avenue, New York, New York 10028.

14.     Defendant Majid Fateh is a fertility specialist, practicing in New York. He is licensed in the State of New York. He has an office located at 1016 Fifth Avenue, New York, New York 10028.

15.     Defendant Michael Femi Obasaju is an embryologist, practicing in New York. He has an office located at 1016 Fifth Avenue, New York, New York 10028.

16.     At all relevant times, the Defendants were agents, servants, partners, members, conspirators, employees, and/or joint venturers with or of each other.

17.     At all relevant times, the Defendants were operating and acting within the course and scope of their respective agency, service, partnership, membership, employment, and/or joint venturer relationships.

## IV.     Fact Allegations

**New York Fertility Institute**

18.     The Plaintiffs were advised that they may need assistance to have a child and decided to investigate in-vitro fertilization (IVF).

19.     They researched fertility clinics in New York.

20.     NYFI's website touts NYFI's team as "world-class leaders in fertility care for more than 30 years," who "treat patients like family," "create in-depth, personalized treatment plans," and "have been voted Top Doctors In New York and the Best Family Doctors in America multiple times over." It boasts that it "has the experience and advanced technology to suit every patient's unique goals."

21.     The Plaintiffs were willing to travel from the UK to the US to work with the Defendants because—the Defendants led them to believe—they would be receiving IVF,

preimplantation genetic diagnosis (PGD), and preimplantation genetic screening (PGS) services from a clinic and specialists offering qualified providers, state-of-the-art technology and better-than-average success rates.

22.     On September 15, 2021, the Plaintiffs consulted with Fateh in the Defendants' New York office.

23.     The Does asked Fateh how the Clinic kept from mixing up or misplacing embryos and whether the staff had had any issues with mix-ups in the past.

24.     Fateh said that Obasaju was a top-class embryologist, the Clinic had an excellent track record, all material was meticulously labelled, and the Clinic had never had any problems.

25.     The website contains a lengthy biography of Obasaju, NYFI's laboratory director and embryologist.

26.     According to the NYFI website, Obasaju became the Director of In-Vitro Fertilization (IVF) & Andrology & Hormones Laboratories in 1997.

27.     According to the NYFI website, before he worked at NYFI, Obasaju was the Director of IVF Laboratory at Mount Sinai Medical Center, New York, and, before that, the Director of IVF Laboratory at the IVF America Program in Mineola, New York.

28.     The website omits Obasaju's work as an embryologist for Dr. Lillian D. Nash of IVF New York, including in 1998 and 1999.

29.     Fateh told the Plaintiffs they need not worry about their embryos being misplaced or mislabeled; that Obasaju was very careful, and the Defendants had been doing their work for many years with no problems.

30.     Fateh said that Defendants could perform all of the services in which the Plaintiffs were interested—IVF, PGD, and PGS—in the time frame desired by the Plaintiffs.

31.     The Defendants advised the Plaintiffs that the passage of time greatly influences a couple's chances of a viable and healthy pregnancy. Age of the male and female partner is a significant factor in fertility. For example, the quantity and quality of the female partner's eggs greatly diminishes over time.

32.     Fateh evaluated the fertility of both partners.

33.     He said he was "alarmed" by John Doe's test results. Ultimately, after ordering another $2,500 of tests of questionable value, Fateh advised the Plaintiffs they should proceed with IVF without worry as to John Doe.

34.     He said the initial ultrasound showed the lining of Jane Doe's uterus was very healthy, that she had polycystic ovaries (of which she was previously aware), that people with polycystic ovaries are typically ideal candidates for IVF, and that there would be a statistically greater chance of them having twins if they were able to have a baby naturally.

35.     At multiple times, Fateh spoke of egg retrievals from healthy candidates of Jane Doe's age and health resulting in twenty or more eggs.

36.     Having multiple viable embryos available provides additional chances for pregnancy without incurring the staggering cost of another egg retrieval before each implantation.

**The IVF Services**

37.     Relying on NYFI's website, their consult with Fateh, the statements he made in that conversation, and his evaluation that the Plaintiffs had good chances for a successful pregnancy, the Plaintiffs decided to proceed with IVF at NYFI.

38.     Fateh insisted that Jane Doe arrive in New York as close to the start of her menstrual period as possible to begin treatment. The Defendants were aware that Jane Doe had irregular periods, and the timing of her next period was uncertain. Jane Doe explained that a last-minute international flight (from London to New York) would be extremely expensive for the Does and that COVID-related flight cancellations were frequent at that time, and she asked if there was any flexibility in the timing of treatment. The Clinic said that beginning her treatment by day three of her cycle would be too late: that she must fly to New York as soon as her period began. As instructed, Jane Doe did exactly this. Her period began November 12, 2022. She notified the Clinic. She booked a flight for the next day. And, she arrived in New York on Saturday, November 13. She expected to begin treatment that day given the urgency expressed by the Defendants. Yet, the Defendants told her she should not go into the Clinic until Monday.

39.     The treatment process began immediately before Thanksgiving 2021. Jane Doe underwent nine days of hormone injections and, the day before Thanksgiving, the Defendants performed the egg retrieval. Jane Doe's eggs were retrieved on November 24, 2021.

40.     Sultan reviewed Jane Doe's ultrasounds during the process and said she had lots of follicles, and everything was growing very well.

41.     Twelve eggs were retrieved.

42.     The Plaintiffs were very surprised and upset that more eggs were not retrieved based on Fateh's and Sultan's previous statements.

43.     From the twelve harvested eggs, the Plaintiffs expected to get four to six healthy female embryos.

44.     The next morning, Obasaju informed the Plaintiffs by telephone that two eggs were not mature enough to be fertilized and nine of the remaining ten eggs were fertilized.

45.     He said he expected six to seven of the embryos to develop to a point where they could be biopsied for genetic abnormalities.

46.     The Plaintiffs were shocked and upset by his news. Prior to this conversation, none of the Defendants informed the Plaintiffs there was a real possibility that not all the fertilized embryos would make it through to the biopsy stage.

47.     Only after the Plaintiffs asked for an explanation of the remainder of the process for growth and genetic testing in this phone call, did Obasaju provide details about the embryo cultivation process, embryo development, and the risks of losing embryos at different points. None of the Defendants provided this critical information in any of the Plaintiffs' in-person consults, phone calls, or video calls prior to this phone call.

48.     The Plaintiffs immediately emailed Defendants with their concerns. Sultan called Plaintiffs in response to the email. In the call, the Plaintiffs explained they were extremely distressed to hear that Obasaju only expected six to seven embryos to complete all stages of the culture process, as that could potentially leave the Plaintiffs with no viable embryos to implant after testing for genetic conditions. The Plaintiffs said that they should have been walked through the entire embryo culture process, so they had a clear understanding of what to expect.

49.     Sultan repeatedly dismissed the Plaintiffs concerns and told them not to worry because they only needed one healthy female embryo to proceed to implantation.

50.     The Plaintiffs were never told that there was additional risk of losing embryos after the fertilization process, and that they would keep losing embryos during the embryo culture phase.

51.     John Doe's mother also spoke with Sultan. She asked how the Does would know which embryos were male or female, and healthy or unviable. The Defendants assured her and the Does that all genetic material would be correctly labelled. In addition to assuring her there would be no mistakes in labelling the embryos, Sultan explained the post-retrieval process, but entirely omitted the risk that embryos may be lost in the fertilization and hatching process.

52.     The Plaintiffs were never told and certainly *never* expected that their chances of getting pregnant might rest on a single embryo at the end of the expensive, invasive, time-consuming process.

53.     The Plaintiffs were very unhappy, but agreed to wait and see what the results were at the end of the culture process.

54.     Several days later, Obasaju informed the Plaintiffs that six embryos developed sufficiently for biopsy.

55.     Obasaju took small biopsies from the six embryos and sent them to Invitae, an external testing company, for Preimplantation Genetic Testing ("PGS").

56.     PGS is commonly used during IVF to screen out embryos with genetic abnormalities that are likely to cause birth defects or miscarriage.

57.     After the communication from Obasaju, the Plaintiffs sent another email to Defendants on December 1, 2021.

58.     In that email, the Plaintiffs explained that, from all the conversations they had with the Defendants, they understood that not all the retrieved eggs would fertilize, but they did understand all the fertilized eggs would grow and go off to be biopsied. The Plaintiffs were never told that there was risk after the fertilization process, and that they would keep losing embryos during this phase. The very minimal paperwork on the process sent to the Does was not sent until *after* Jane Doe's treatment had begun and the Plaintiffs had already paid in full. Further, the Clinic staff did not correct the Does' misunderstanding(s) in an email responding to Jane Doe's email sent November 19, 2021 summarizing Jane Doe's understanding of the process and asking if her understanding was correct.

59.     On December 2, 2021, Fateh responded by email to the Plaintiff's December 1 email.

60.     On December 3, 2021, the Plaintiffs spoke with Fateh. Initially, Fateh said he was sure he had told the Plaintiffs everything about the embryo culture process, including the risks of losing embryos, during their initial consultation, but the Plaintiffs were adamant that he did not. The Plaintiffs explained they looked at the sheet he gave them with his drawings and handwriting, and there was no reference to this additional stage and potential embryo loss. Like Sultan, Fateh encouraged the Plaintiffs to wait and see what the biopsy results were and said they only needed one healthy female embryo to proceed.

61.     The Plaintiffs received the Invitae PGS results on December 6, 2021. Only one of the six embryos was a healthy, chromosomally normal female. A second was inconclusive. The other four embryos tested were reported to be genetically abnormal.

62.     Sultan called the Plaintiffs to talk through the results. He explained that the Plaintiffs could have the inconclusive embryo biopsied again.

63.     Accordingly, the Plaintiffs decided to have the inconclusive embryo biopsied again, and the Clinic advised that would be no problem and they would arrange it.

64.     A few days later, Fateh called the Plaintiffs and strongly urged them not to re-biopsy the indeterminate embryo. He stated that the biopsy process requires unfreezing and refreezing the embryo, which puts the embryo's survival at significant risk.

65.     He proposed that Defendants implant the indeterminate embryo into Jane Doe's uterus, see whether the pregnancy took, and–if the pregnancy took–then test for genetic abnormalities. If abnormalities were found, he said Jane Doe could abort the baby at that time.

66.     The Plaintiffs were shocked for two reasons. First, Fateh suggested abortion as a way to manage the IVF process, and second Fateh suggested Jane Doe put her body through pregnancy just to avoid retesting the indeterminate embryo.

67.     The Plaintiffs told Fateh they would think about the options he presented and let him know. They expressed again how disappointed they were with the results and how they believed they were not provided a full and proper understanding of the risks before they began the IVF process.

68.     The Plaintiffs decided to wait to retest the indeterminate embryo until after attempting to implant the viable female embryo.

69.     At that time, Fateh said if their implantation did not work and the Plaintiffs had to do another round of IVF, that he would arrange a discount on a second round.

70.     The Plaintiffs prepared to schedule a transfer in the Summer of 2022 with the Defendants. Initially, the Plaintiffs considered a June 2022 transfer, but then requested the transfer process be performed in late August or early September. The Plaintiffs let the Defendants know their flights were booked and that unexpected revisions to the schedule by the Defendants, whether due to failing to provide complete information about steps in the IVF process or due to moving the date of the procedure, would be costly to the Plaintiffs.

71.     In the meantime, the Plaintiffs looked into what they needed to set in place in London, should Jane Doe become pregnant after the first transfer.

72.     The Does contacted NYFI for assistance. At the initial consultation with Defendants in November 2021, the Defendants assured the Plaintiffs that the Clinic regularly worked with doctors in London for post-implantation monitoring and care and would connect the Plaintiffs with someone who could provide such care.

73.     After some difficulty and delay, the Plaintiffs finally received from the Clinic the name of a London doctor.

74.     Defendants also revealed for the first time that they expected to be paid $250 to collect and review each blood test and ultrasound conducted in London, notwithstanding that the London lab and/or doctor would be performing and/or reviewing these. In other words, the $250 per test fee would be on top of the fees charged by the London lab and medical staff.

75.     Defendants advised that Jane Doe should have two blood tests and one ultrasound every week for the first eight to nine weeks of pregnancy.

76.     The substantial cost for and frequency of labs was not disclosed by the Defendants when the Plaintiffs asked questions about post-pregnancy care in London in prior consults with Defendants.

77.     When the Plaintiffs sought to confirm the UK post-implantation care details with Fateh in a call, he was terse and condescending. The Plaintiffs were frustrated at having to spend so much time and effort finding and coordinating care in London considering the Defendants initially represented that they worked with several clinics in London. It was not until this conversation, that Fateh finally provided the name of the London clinic with which the Defendants worked and stated the staff of the Clinic would arrange it.

78.     After this call, the Clinic was advised the Plaintiffs were planning an end-of-summer transfer.

79.     The Plaintiffs organized their personal and work schedules and booked flights for arrival in New York in August 2022, with a return to London in October 2022, to accommodate the full length of the process they contracted to undergo at NYFI.

**NYFI Suddenly Advises Plaintiffs It Is Shuttering Its Doors Imminently**

80.     On April 20, 2022, NYFI contacted Jane Doe, and she called them immediately.

81.     NYFI suddenly advised her they were closing the Clinic imminently because their embryologist was leaving.

82.     Despite knowing that the Plaintiffs chose NYFI so that they could go through the whole IVF process at a single clinic in New York, New York and despite knowing that the Plaintiffs had restructured their work, personal, and financial lives to accommodate an embryo transfer at

the end of summer, Defendants told Plaintiffs that NYFI would not be open for much longer, and

certainly not through August or September 2022.

83.    NYFI said it was possible that, if Jane Doe started the process immediately, NYFI

might be able to complete a transfer by the first week of June. NYFI did not recommend any other

practice or doctor at the time it advised the Plaintiffs that it was shutting down imminently.

84.    The Plaintiffs could not accommodate an early June procedure for all the reasons

stated above. Even more importantly, Jane Doe was not due to get her period until the end of May

so could not start the process in the time frame proposed by NYFI in any event.

85.    NYFI's undisclosed closing on short notice defeated the very purpose of the

Plaintiffs' agreement with NYFI. The Plaintiffs must research and contract with an IVF provider.

Again. The Plaintiffs must pay for IVF services. Again. And, Jane Doe must go through the

invasive and uncomfortable egg retrieval process. Again.

**Plaintiffs Discover NYFI Concealed Material Information and Made Fraudulent Statements About Obasaju**

86.    Soon after learning of NYFI's imminent closing, the Plaintiffs also learned that

while they were undergoing services at NYFI—i.e., while Fateh represented vehemently NYFI had

never mixed up or lost embryos, NYFI's embryologist did exactly this.

87.    In 1998, while working as an embryologist at IVF New York, another fertility clinic

located in New York, New York, Obasaju mistakenly transferred embryos belonging to another

couple to the wrong client.

88.    Obasaju was working for NYFI as an embryologist at the same time this incident

happened. NYFI knew of Obasaju's employment history and this incident. Yet, it disclosed neither

that Obasaju worked at IVF New York or that this error happened to NYFI's prospective clients, including the Plaintiffs, whether in its website or in response to client questions.

89.     Obasaju's biography page on the NYFI website makes no mention of his work at IVF New York.

90.     NYFI intentionally hid this history from prospective clients of the Clinic, like the Plaintiffs.

91.     In addition, NYFI, Sultan, and Fateh were defendants in a lawsuit that alleged the Clinic mistakenly transferred a "special circumstances" embryo into a woman's uterus—instead of the healthy embryo that was selected for transfer—and "lost" the healthy embryo for 18 months.

92.     The Defendants are also subject to a pending lawsuit that primarily claims the Clinic wrongly transferred a stranger's embryo into the wrong client and knowingly let the implantation proceed to pregnancy without notifying the client of its mistake.

93.     The Defendants did not disclose this information to the Plaintiffs.

94.     The Defendants denied anything like this happened at the Clinic when asked by the Does even though the Defendants knew of each of the instances at the time the Does asked.

95.     Had Defendants disclosed any of this information to the Plaintiffs, the Plaintiffs would not have used Defendants.

96.     Each Defendant intentionally hid this information from the Plaintiffs by failing to disclose it when the Plaintiffs first sought out fertility services and by explicitly denying events of this kind ever happened when the Plaintiffs raised questions about embryo labeling and chain of custody.

97.     In light of the history of such mistakes, it is even more concerning that Sultan and Fateh were so insistent in their repeated, false assertions to the Plaintiffs that the Clinic had no history of errors.

98.     Defendants' repeated and forceful assurances to Plaintiffs were not based on a good-faith belief, but were intentionally designed to give the Plaintiffs a false sense of security so that they would proceed to purchase IVF services from Defendants.

99.     Even after entering into a contract, Sultan, Fateh, and Obasaju had multiple chances to engage in open communication with the Plaintiffs and to disclose the information needed to enable the Plaintiffs to make informed decisions about the risks and consequences of each aspect of the fertility treatment and about proceeding to use the services of the Clinic. Instead, the Defendants intentionally kept silent to induce the Plaintiffs to keep paying Defendants' fees.

100.     As a result of the Defendants' breaches of contract, misrepresentations, and fraudulent statements, the Plaintiffs were induced into entering a contract with NYFI and were further induced to keep paying fees to NYFI.

101.     As a result of the Defendants' breaches of contract, misrepresentations, and fraudulent statements, the Plaintiffs incurred costs for travel, pharmacy, testing, an anesthetist, specialized frozen storage, laboratory costs, and other fees and, now, must find a way to pay for a second round of IVF, without Fateh's offered discount, through another clinic that remains open and in business.

V.      **Claims**

**Count One: Breach of Contract**
**(Against NYFI, M. Fateh & K. Sultan M.D.S., P.C., and 1016 5th Ave. Gynecology, P.C.)**

102.    Plaintiffs incorporate all paragraphs by reference.

103.    Plaintiffs entered into a contract with Defendants NYFI, M. Fateh & K. Sultan M.D.S., P.C., and 1016 5th Ave. Gynecology, P.C. for various IVF services, including but not limited to embryo culturing, testing and cryopreservation, storage, and safeguarding, as well as the transfer of frozen embryos created from Plaintiffs' biological material.

104.    There was a meeting of the minds between Plaintiffs and the Clinic that the Clinic would be operational, capable of performing all the services, and would perform the contracted for services at the places and times agreed.

105.    The terms of this contract were memorialized in writings. Any remaining terms were formed orally.

106.    Plaintiffs provided consideration for these services and upheld their end of the bargain by promptly paying all amounts due and owed.

107.    It was the intent of Plaintiffs and the Clinic that all sides would be held to their end of the bargain, i.e., that the parties had a binding legal contract.

108.    The Clinic had a contractual duty to perform all services as agreed upon and as memorialized in records, the parties' agreements, the parties' communications, and the parties' stated intentions.

109.    The Clinic materially breached its obligations by failing to inform the Plaintiffs properly and accurately as to the nature and risks of the IVF services contracted to be performed and by ceasing to offer the agreed services at the timing agreed between the parties.

110.    The Clinic exacerbated the damages caused by these breaches by hiding and failing to disclose the true backgrounds of NYFI and Obasaju to Plaintiffs and affirmatively lying to the Plaintiffs to cover up the Defendants' history of mixing up, losing, and mis-implanting embryos.

111.    The Clinic's breaches caused the Plaintiffs' harm.

**Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against NYFI, M. Fateh & K. Sultan M.D.S., P.C., and 1016 5th Ave. Gynecology, P.C.)**

112.    Plaintiffs incorporate all paragraphs by reference.

113.    In every contract there is an implied covenant of good faith and fair dealing which encompasses any promise that a reasonable person would be justified in understanding was included in the contract.

114.    The Clinic's conduct, including but not limited to the Clinic's provision of incomplete information and outright lies and its failure to disclose that it would not complete the services for which the Plaintiffs contracted on the schedule agreed constitutes a breach of the implied covenant of good faith and fair dealing, which resulted in damages to Plaintiffs.

115.    The Defendants' conduct caused the Plaintiffs' harm.

**Count Three: Fraud/Fraudulent Inducement**
**(Against Fateh, Sultan, NYFI, M. Fateh & K. Sultan M.D.S., P.C., and 1016 5th Ave. Gynecology, P.C.)**

116.    Plaintiffs incorporate all paragraphs by reference.

117.    The Clinic, Fateh, and Sultan marketed and promoted NYFI's services and made representations to the public and to Plaintiffs regarding the history and quality of those services as described herein.

118.    The representations of the Clinic, Fateh, and Sultan were false and/or meaningfully incomplete, and they either knew the truth or made the representations without regard for the truth.

119.    They intended for Plaintiffs to rely on their representations and to pay them to perform IVF services, and Plaintiffs reasonably relied on these representations when purchasing such services.

120.    Had Plaintiffs been apprised of the history of errors and that the Clinic could not provide all the services promised in the time promised, Plaintiffs would not have purchased or continued purchasing such services.

121.    The Clinic, Fateh, and Sultan intentionally suppressed and concealed material facts concerning the services being provided, including but not limited to the fact that both NYFI and Obasaju had been involved in mislabeling, losing, and mis-implanting patients' embryos.

122.    The Clinic, Fateh, and Sultan intentionally failed to notify Plaintiffs of risks in the IVF process.

123.    The omission and concealment of these facts made the Clinic's, Fateh's, and Sultan's actual disclosures intentionally deceptive regarding their history and processes, the risks involved in the IVF process, and the facts of the Plaintiffs' specific IVF process.

124.    Plaintiffs had no reasonable means of knowing that the Clinic's, Fateh's, and Sultan's representations about these topics were incomplete, false, or misleading. Plaintiffs did not and reasonably could not have discovered this deception prior to purchasing (and continuing to pay for) these services.

125.    Had Plaintiffs been apprised of the true facts, Plaintiffs would not have contracted with the Defendants for fertility services of any kind.

126.    Defendants were under a duty to disclose the true facts to Plaintiffs.

127.    This duty arose by reason of Defendants' exclusive knowledge regarding the true facts and because Defendants made partial, erroneous representations about relevant facts without disclosing material facts needed to understand the truth.

128.    Defendants intended to deceive Plaintiffs by concealing the true facts.

129.    Plaintiffs reasonably relied to their detriment upon Defendants' material omissions and misrepresentations. Plaintiffs were unaware of the omitted material facts and would not have acted as they did if these facts been disclosed.

130.    Plaintiffs sustained damage as a direct and proximate result of Defendants' fraud, deceit, and fraudulent concealment.

131.    Defendants' fraud, deceit, and concealment was a substantial factor in causing Plaintiffs' harm.

132.    These acts and omissions were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights, interests, and wellbeing to enrich Defendants.

## Count Four: Violations of NY GBL 349 and 350
### (Against the Clinic)

133.    The Plaintiffs incorporate all paragraphs by reference.

134.    Sections 349 and 350 of New York's General Business Law protects consumers by prohibiting all deceptive acts and practices, including false advertising, in the conduct of any business, trade or commerce, or in the furnishing of any service in the State.

135.    The Clinic's advertising and services are directed towards consumers in that the Clinic routinely and regularly advertises its services to residents throughout the United States, including residents living within the State of New York, as well as in other countries.

136.    The Clinic's advertising and services were directed towards the Plaintiffs and resulted in Plaintiffs retaining and utilizing Defendants services.

137.    The Clinic's acts and practices violated New York's General Business Law including by:

a.    Representing that its services, processes, and procedures had characteristics, uses, and benefits they did not have;

b.    Representing that its services, processes, and procedures had success rates that they did not have;

c.    Advertising services with the intent not to sell them and/or render them as advertised; and

d.    Representing the backgrounds of its professional staff in a way that omitted the staff's previous employers and actively concealed serious negligence and errors made by the staff in their previous employment and by the Clinic.

138.    The Clinic's conduct and activities were deceptive, fraudulent, false, and misleading, and thereby constitute violations of Sections 349 and 350 New York's General Business Law.

139.    Plaintiffs have suffered substantial injuries as a direct result of the Clinic's deceptive, fraudulent, false, and misleading conduct.

140.    The Clinic's conduct has caused, and will continue to cause, irreparable injury to Plaintiffs.

141.    The Clinic's conduct as set forth herein violates the law, including New York's General Business Law(s).

**VI.     Prayer for Relief**

WHEREFORE, Plaintiffs respectfully pray for relief and judgment as follows:

(a)     Compensatory damages;

(b)     Consequential damages;

(d)     Statutory penalties;

(e)     Punitive damages;

(f)     Attorneys' fees;

(g)     Costs;

(h)     Pre- and post-judgment interest;

(j)     Such other additional and further relief that is just and proper.

VII.    **Demand for Jury Trial**

Plaintiffs hereby demand a jury trial of all causes of action so triable.

Dated:  New York, New York
        July 15, 2022

THE SENIAWSKI LAW FIRM PLLC

By: */s/Barbara L. Seniawski*
Barbara L. Seniawski
1460 Broadway, 4th Fl.
New York, New York 10036
Tel: (212) 595-4536
Fax: (917-591-4692
barbara@seniawskilaw.com